UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| MICHELLE STEVENSON<br>5687 Faircloth Court<br>Centreville, VA 20120<br><br>    Plaintiff,<br><br>    v.<br><br>NAVY FEDERAL CREDIT UNION<br>820 Follin Lane<br>Vienna Virginia 22180.<br><br>    Defendant. | **Jury Trial Requested**<br><br>Case No.: _____ |

## COMPLAINT

Plaintiff Michelle Stevenson ("Plaintiff" or "Stevenson"), by and through undersigned counsel, for her Complaint against Defendant, Navy Federal Credit Union ("NFCU"), alleges as follows:

1. Plaintiff brings this action against Defendant for damages arising out of the company's retaliation against her for blowing the whistle on NFCU's illegal mortgage lending practices in violation of the anti-retaliation provision of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), 12 U.S.C. §5567(a), and the Virginia Human Rights Act Whistleblower Protection, Virginia HB 798.

## JURISDICTION AND VENUE

2. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims herein arise under laws of the United States. This Court further has jurisdiction over the claims raised herein pursuant to 12 U.S.C. § 5567.

1

3. This Court may properly maintain personal jurisdiction over Defendant because Defendant's contacts within this state and judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice.

4. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3). Plaintiff was employed by Defendant in this judicial district; Defendant is located in this district; the unlawful employment practices at issue occurred in this district; and/or a substantial part of the events or omissions giving rise to her claims occurred in this judicial district.

## ADMINISTRATIVE PROCESS

5. Prior to instituting this action, Plaintiff filed a complaint with the Occupational Safety and Health Administration ("OSHA") on February 13, 2019, alleging that NCFU retaliated against her for raising concerns internally that the NFCB lending practices did not comply with CFPB Regulation Z (Ability to Repay and Qualified Mortgage Standards Under the Truth in Lending Act). 12 U.S.C. § 5567(c)(1)(a); 29 C.F.R. 1985.103. OSHA Complaint, attached as Exhibit A.

6. The Secretary of Labor has not issued a final order within 210 days after the date of the filing of the OSHA complaint.

7. Plaintiff will serve on OSHA a copy of this file-stamped complaint within seven days of filing in federal court.

## PARTIES

8. From May 2000 to present, Plaintiff Michelle Stevenson ("Stevenson") was an employee of Defendant Navy Federal Credit Union ("NFCU").

9. At all times relevant to the Complaint, Plaintiff has been and is a resident of Virginia.

10. Defendant NFCU is a privately held company that offers various banking and financial services including, but not limited to, mortgage lending.

11. Defendant, NFCU's headquarters are located at 820 Follin Lane, Vienna, Virginia 22180.

12. Defendant NFCU conducts business operations from and has an office located at 12851 Worldgate Drive, Herndon, VA 20170.

## FACTUAL BACKGROUND

13. As stated herein, in May 2000, Ms. Stevenson began her employment with NFCU, as a Supervisor of Mortgage Underwriting, working in Herndon, Virginia. Ms. Stevenson transitioned to the Assistant Manager of Mortgage Underwriting in August 2017.

14. As an Assistant Manager of Mortgage Underwriting, Plaintiff was responsible for: a) assisting with planning, directing and managing the multi-function operations of the Mortgage Underwriting branch; b) ensuring compliance with applicable federal and state laws, rules, regulations, and NFCU policies and procedures; c) ensuring consistent risk analysis was applied to all first mortgages and equity loans to ensure complete, accurate loans were produced and document integrity was maintained; d) evaluating and adjusting branch work quality, staff performance, systems, processes and procedures to meet goals; e) managing daily activities of 40+ direct reports; f) supporting senior management in developing and executing strategic plans; and g) acting as Manager in the incumbent's absence.

### Dodd-Frank Act Requirements

15. Under the Dodd-Frank Act, when deciding whether to approve a mortgage loan, creditors must make a "reasonable and good faith determination . . . that, at the time the loan is consummated, the consumer has a reasonable ability to repay the loan, according to its terms, and all

applicable taxes, insurance (including mortgage guarantee insurance), and assessments." 15 U.S.C. § 1639c(a); see also 12 CFR § 1026.43(c)(1).

16. In making this determination, the creditors must consider the factors set out in the CFPB's regulations. *See* 12 CFR § 1026.43(c)(2). The CFPB also permits creditors to consider additional factors - called "compensating" factors" – when deciding whether to approve a mortgage loan. *See* CFPB Commentary, 12 C.F.R. § Pt. 1026, Supp. I, Part 3.

17. All information that a creditor considers when deciding whether to approve a mortgage loan must be "verified and documented." 15 U.S.C. § 1639c(a); see also 12 CFR § 1026.43(c)(3).

### Stevenson Reports Dodd-Frank Violations

18. As Assistant Manager of Mortgage Underwriting, one of Plaintiff's duties was to ensure that the underwriters who reported to her were following all applicable laws and regulations.

19. On or about May 2017, Plaintiff learned that NFCU was taking compensating factors into account when issuing loans, but not requiring verification or documentation of the information. See 15 U.S.C. § 1639c(a) (requiring verification and documentation of ability to repay); 12 CFR § 1026.43(c)(3) (compensating factors are factors in ability to repay).

20. Deborah Berg ("Berg"), VP of Mortgage Underwriting, sent an email or Enet internal message in 2015-2016 that compensating factors did not need to be documented.

21. Also, Plaintiff became increasingly aware of pressure put on underwriters by management that affected the underwriter's "reasonable and good faith determination" that a consumer would have the ability to repay a loan. See 12 CFR 1026.43(c)(1).

22. If underwriters denied a loan, Berg would pull reports to see what loans were denied. Berg would have a different underwriter (one of her favorites such as Benjamin Warren, Sandy King

and Christie West) overturn the loan decision and approve the loans. The original underwriter who denied the loan would see this changed decision if the loan required reapproval (loan amount was increased for instance).

23. On June 30, 2016, Leslie DeDona from Employee Relations contacted Stevenson to substantiate complaints from certain underwriters. Stevenson shared that there was favoritism and disparity in treatment by Berg, but Stevenson did not wish to discuss the details because she was concerned about retaliation from management such as getting transferred into a different section.

24. Between 2016-2017, several underwriters came to Stevenson stating that they were being pressured by Berg to approve loans that were not justifiable and which the underwriters believed were not likely to be paid back. These underwriters included Teresa Judd, Mary Page, Wanda Dickey and Kathy Song. They felt uncomfortable approving the loans that Berg dictated they approve. The loans included low credit scores (often below 600), and debt to income that was not within guidelines (Fannie Mae conventional debt to income ratio to qualify was 38-41 percent and underwriters were forced to approve 55-70 percent). Stevenson told the underwriters that they were following the direction of the branch and that all they could do was to put in the notepad section "per Debra Berg" so that the underwriters could at least document who was making the loan decisions.

25. If underwriters did not agree with Berg's questionable loan decisions, Berg would exclude them from participating on her underwriting council which met once a month to discuss things in the department that could be improved, and changes that were coming to the department.

26. Specifically, Teresa Judd and Mary Page, both underwriters, called Stevenson in tears about the pressure they felt from Berg to approve loans that they thought would go bad in the future.

27. The CFPB issued Supervisory Highlights in May 2017 explicitly stating, "creditors verify the information that they will rely upon to determine the consumer's repayment ability, using reasonably reliable third-party records. A creditor must verify the amounts of income or assets the

5

creditor relies on to determine a consumer's ability to repay the loan using third-party records that provide reasonably reliable evidence of the consumer's income or assets." Supervisory Highlights are binding notice for lending institutions.

28. On May 2, 2017, June 1, 2017, and November 29, 2017, Plaintiff sent emails to her supervisory chain advising of the Consumer Financial Protection Bureau ("CFPB") supervisory guidelines and the requirement to document compensating factors i.e. income and assets used for credit qualifying purposes for residential mortgage loans.

29. Specifically, On May 2, 2017, Stevenson sent an email to Melissa Hendrix, Assistant Manager, Mortgage Underwriting, and Deirdre Harvey, which stated, "The branch policy is to notate compensating factors but not verify. Given the most recent supervisory highlights do we need to revisit this policy?"

30. In the May 2, 2017 email, Stevenson explained, "a creditor must use reasonably reliable evidence from third-party records to verify the amounts of income or assets the creditor relies on to determine a consumer's ability to repay the loan, but that the rule does not require a certain method by which the verification must occur."

31. On May 3, 2017, Melissa Hendrix ("Hendrix"), Assistant Manager Mortgage Underwriting (Vienna, VA), sent an email to Mark Talbott ("Talbott"), Manager Mortgage Underwriting (Pensacola FL), stating, "Michelle brought up a great point below, based on the CFPB Supervisory highlights, should our policy on verifying compensating factors be updated for both 1st mortgage and equity? Additionally, a Compliance blog, reiterates what Michelle has below. It appears when making Non-QM loans, CFPB is looking for lenders to verify income/assets – where in today's world, we do not document compensating factors (IE: additional asset) with a third party source. We use the Signed 1003 as a testament that the borrower has those specific funds. I wanted to get your thoughts if we should escalate higher."

32. On June 1, 2017, Plaintiff again provided the information about compensating factor documentation requirements by email to Hendrix and Talbott.

33. On November 27, 2017, Plaintiff provided the information by email about compensating factors to Rebecca Horne ("Horne"), and included on the email Richard Appleton ("Appleton"), Manager Mortgage Underwriting (Vienna, VA), Talbott, Sandy King ("King"), Assistant Manager Mortgage Underwriting (Vienna, VA), and Deirdre Harvey ("Harvey"), Assistant Manager Mortgage Underwriting (Pensacola, FL).

34. Despite Plaintiff's efforts, the guidance relating to compensating factor documentation was not adopted.

35. Plaintiff continued to be aware of underwriters feeling that there would be company retaliation for not approving loans.

36. From July 17-18, 2018, Stevenson met with Employee Relations Representative, Lesley R. DeDona ("DeDona"), and reported employee morale and concerns with lending practices. Regarding her concerns with lending practices, Stevenson told DeDona that Mortgage Underwriters and supervisors felt pressured to make loan decisions. Approval rates and their decrease/increase were often topics of discussion during Town hall sessions – putting pressure on underwriters to increase approval rates. Underwriters felt that if they did not push to approve loans or have an opinion with regard to underwriting practices they would be excluded from projects, removed from the council meetings, even harassed and questioned about their decisions. Underwriters were willing to approve mortgages outside of guidelines but only with verifiable documentation to support their decision. Berg's directive was to only "note" the compensating factors but not condition the loan to verify the compensating factors used to make the decision. Concerns with this process were brought to Berg's attention but there was no change to the original directive.

37. From July 17-18, 2018, Plaintiff also informed DeDona that Berg was involved in the processing of Berg's daughter's loan in July 2018, so much so that Berg notified the reviewing Mortgage Production Employee Loan Supervisor that the asset documentation was not going to be provided and instructed the supervisor to move forward without verification of assets.

38. Specifically, supervisor Marcello Fernandez was called into Deborah Berg's office in July 2018 (in the presence of Sandy King) and told to remove any conditions relating to the verification of assets (a compensating factor) and told that Berg would not provide any documentation to support assets on the application. Fernandez followed Berg's directive, Fernandez removed the asset verification requirement..

39. Stevenson explained to DeDona that failing to document compensating factors violated CFPB policy. See 15 U.S.C. 1639c(a); 12 CFR 1026.43(c)(3); CFPB Commentary, 12 C.F.R. § Pt. 1026, Supp. I, Part 3 (discussing "compensating factors").

40. Stevenson also explained to DeDona that company pressure on underwriters was affecting their ability to make objective "reasonable and good faith determinations" of ability to repay because underwriters feared company retaliation if their approval numbers were too low, also violative of CFPB policy. See 12 CFR 1026.43(c)(1).

41. Stevenson also shared with DeDona the comments made by a 25-year mortgage underwriting employee, Teresa Judd, who had recently retired. Judd stated that part of the reason Judd left the credit union was because of the unethical loan decisions she was forced to make.

42. Stevenson and DeDona exchanged emails through August 2018, involving the concerns Stevenson raised in July 2018.

43. In early October 2018, DeDona resigned from her position at NFCU and Employee Relations Representative, and Claudia Kipp ("Kipp") was assigned to investigate the issues and concerns Stevenson raised with DeDona.

**NFCU Retaliates Against Stevenson**

44. On or about October 4, 2018, Plaintiff started being excluded from emails and project information. Colleagues began to forward relevant emails to Plaintiff, which Plaintiff had not received directly. Specifically, Berg had someone else send an email to Appleton and Jennifer Wilson, one of Stevenson's direct reports, about a meeting on October 18, 2018, to discuss loan denial letters and what should be put on the letters. Stevenson was not included on the meeting invite and yet her direct report was included. Jennifer Wilson forwarded the email to Stevenson.

45. On October 4, 2018, Stevenson notified Kipp via email that she was being excluded from emails, projects, and discussions. Stevenson's employees began forwarding her copies of meetings invites about quality control that she was not copied on. In her email to Kipp, Ms. Stevenson questioned whether she was being retaliated against. Kipp offered to meet with Stevenson on October 17, 2018. During the meeting, Stevenson went over the information and concerns she had previously disclosed to DeDona and again reported the lending practices and employee issues that she reported in July 2018. Stevenson explained that she was being left out of meeting invites and forwarded all the information that was forwarded to DeDona prior to DeDona's resignation.

46. On October 19, 2018, Plaintiff met with Appleton, Berg and Elizabeth Boruhovin ("Boruhovin"), Assistant Vice President, Risk and Training Management (Vienna, VA). At that meeting, Stevenson was informed that she would be transferred to training to help develop underwriting training materials. Additionally, Stevenson would have two new underwriting trainers that would report to her. Stevenson asked if the transfer was optional and if she could decline the transition. Berg notified Stevenson that this was not an optional transfer and Stevenson would be reporting to Real Estate Training on November 12, 2018. At that time, they explained to Stevenson that she could be going to a different facility and that they would "work with [Plaintiff]" on her commute. In addition, Stevenson was not told with whom she would be working.

47. On October 22, 2018, Stevenson voiced concerns about the transition to Mortgage Training to Kipp and expressed that she felt it was retaliation. Stevenson and Kipp had various conversation regarding the position and transfer. They continued communicating via email through the end of January 2019.

48. On about November 12, 2018, Stevenson was transferred to the training department and was told she would be able to solicit for the trainer positions. They asked Stevenson to solicit from the underwriters for the trainer position. Stevenson sent out the notification for the positions and had multiple inquiries at first. However, when employees began learning that there would no change to title, pay or anything of the like, and that they would still be an underwriter; employees became uninterested in the position.

49. Stevenson began reporting to Assistant Manager in Training, Rachel Riley ("Riley"), Assistant Manager Mortgage Underwriting, who was located in Florida. Riley was the same level as Stevenson, assistant manager. In her former position, Stevenson reported to a manager not an assistant manager.

50. In the new training role, NFCU took away the 40+ employees that previously reported to Stevenson.

51. Plaintiff was provided with no expectations for the training position and Plaintiff was asked to write job descriptions for the trainer positions for which there were no candidates.

52. Plaintiff was provided with menial tasks, not ordinarily reserved for an assistant manager. For instance, Stevenson was assigned to act as the go-to person for the new Empower software system, an intake platform for NFCU's mortgage applications and a system that would be used for loan credit decisions. Assistant Managers do not usually perform these non-supervisory tasks.

53. In essence, Plaintiff's new role was to train people to do the job of people Plaintiff used to supervise. Formerly, supervision of employees was only one aspect of Plaintiff's assistant manager role.

54. On January 23, 2019, Stevenson and Kipp had a meeting. Stevenson discussed the lack of progression in her role. Stevenson still did not have the two trainers that she was told would fulfill the trainer positions and she did not have the authorization to hire the two trainers. Stevenson explained that in November 2018, her transition was brought up as something that needed to be done immediately, but approximately three months later, she had not been given the resources and staff she was promised. Kipp informed Stevenson that she was shocked by the lack of progression with Stevenson's role and the failure to build out an underwriting mortgage training team.

55. On about February 1, 2019, Stevenson met with Kipp. In that meeting, Kipp confirmed that Stevenson did not have the direct reports and asked if Stevenson had any other questions. Stevenson asked Kipp if this was the end of the process or if there were an official grievance process. Kipp stated that she would investigate Stevenson's concerns and would follow up.

56. Effective February 15, 2019, Plaintiff was told she must report to Vienna, VA, instead of Herndon, VA. The transfer of location increased plaintiff's commute from 20-30 minutes each way to 1.5-2 hours each way from her home.

57. When Plaintiff arrived in Vienna for the new position, she was provided with no cubicle or desk to sit in. In her former position, Plaintiff had a private office.

58. Plaintiff was eventually provided a cubicle, right next to Berg's office.

59. In her new role, Plaintiff was not involved in anything at the assistant manager level.

60. Berg hardly spoke to Stevenson. Instead, when Berg needed something from Stevenson, Berg called Stevenson's supervisor (who was located in Florida), instead of speaking with

Stevenson, who was seated right outside Berg's office in Vienna, VA. Previously, Berg and Stevenson communicated on a daily basis in Stevenson's former role.

61. There is no upward mobility in the training position. In Plaintiff's former department, Plaintiff had four promotions and 29 pay increases over 19 years, averaging 4-5% per pay increase.

62. In plaintiff's new role, plaintiff was isolated and colleagues stopped talking to Stevenson.

63. Starting in November 2018, Plaintiff suffered medical effects of anxiety, depression, weight loss, insomnia, and PTSD. From August 2, 2019 to present, Plaintiff had to take disability leave from her employment due to the extreme emotional distress her de facto demotion caused.

## COUNT I
## Dodd-Frank Act
## Violation of 12 U.S.C. § 5567(a)

64. Plaintiff re-alleges and incorporates all allegations of this Complaint as if fully set forth herein.

65. At all times relevant hereto, Defendant was a "covered person or service provider" with regard to the employee whistleblower provision of the Consumer Financial Protection Act of 2010, Section 1057 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. § 5567.

66. At all times relevant hereto, Plaintiff was a "covered employee" within the meaning of 12 U.S.C. § 5567.

67. On multiple occasions, Plaintiff provided or caused to be provided to NFCU information relating to acts or omissions that Plaintiff reasonably believed to be violations of the Dodd-Frank Act, including, but not limited to, the following:

    a) On three occasions, on May 2, 2017, June 1, 2017, and November 29, 2017, Plaintiff sent emails to her management chain advising of the CFPB supervisory guidelines

and the requirement that compensating factors for residential mortgages must be documented. See 15 U.S.C. § 1639c(a). Despite Plaintiff's three emails, the compensating factors for residential mortgages continued to be undocumented.

   b)  From July 17, 2018 through August 2018, Plaintiff provided information to Employee Relations about the improper lending practices regarding not requiring documentation for compensating factors in loan approval decisions.

   c)  From July 17, 2018 through August 2018, Plaintiff provided examples to Employee Relations about improper lending practices including one loan relating to Berg's child's loan application, where Berg stated that the documentation supporting the loan would not be provided.

   d)  Plaintiff informed Employee Relations in July 2018 that underwriters felt pressure from the company to approve loans which violated the requirement that underwriters make a "reasonable and good faith" determination of ability to repay, given the pressure the company put on underwriters if their loan approval numbers were too low." See 12 C.F.R. § 1026.43(c)(1).

   e)  Employee Relations Representatives investigated Plaintiff's allegations of Dodd-Frank violations from July to October 2018.

   f)  On October 4, 2018, Plaintiff emailed Kipp, a then-newly hired Employee Relations Representative that she (Plaintiff) was being excluded from emails, projects, and discussions, possibly in retaliation for having raised concerns about Dodd-Frank violations.

   g)  On October 17, 2018, Plaintiff mete with Kipp and again reported the lending practices and employee issues that she reported in July 2018.  Stevenson explained that she was being left out of meeting invites and forwarded all the information that was forwarded to DeDona, the Employee Relations Representative, prior to DeDona's resignation.

h) In October 2018, Employee Relations discussed the allegations relating to improper lending practices with Plaintiff's supervisors, including Berg.

68. Soon after Plaintiff reported violations of the Dodd-Frank Act, NCFU began retaliating against her. *See Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) ("if the employer takes the adverse employment action 'shortly after' learning about the protected activity, courts may infer a causal connection between the two.").

69. These retaliatory acts included, but were not limited to, the following:

a) On or about October 4, 2018, NCFU stopped including Plaintiff on projects and emails.

b) On October 19, 2018, Defendant removed Plaintiff from her position and gave her a new training role, which was not optional. Berg, Appleton and Boruhhovin presented the new role to Plaintiff in a meeting on October 19, 2018.

c) In November 2018, Plaintiff started the new position.

d) In the new training position, Plaintiff had one direct report, compared to the 40 plus direct reports Plaintiff had previously.

e) In the new training position, Plaintiff was given menial tasks and was not included in leadership meetings, like she was in her former position.

f) The new training position was located in a different office (in Vienna, VA rather than Herndon, VA), which increased Plaintiff's commute from 20-30 minutes to 1.5-2 hours each way, given traffic patterns.

g) The new role was a de facto demotion. See Kessler v. Westchester Cty. Dep't of Soc. Servs., 461 F.3d 199, 209–10 (2d Cir. 2006) (reversing summary judgment on Title VII and ADEA claims and concluding plaintiff/employee had adduced evidence that his transfer

was "materially adverse" where employer transferred plaintiff to a position without broad managerial and discretionary function, no direct reports, and was forced to do clerical work).

70. Defendant's actions were more than sufficient to dissuade a reasonable worker from making or supporting a charge against it. See Ott v. Fred Alger Mgmt., Inc., 11 Civ. 4418 (LAP), 2016 WL 5407663, at *9 (S.D.N.Y. Sept. 27, 2016) (defining retaliation as the sort of action that might "dissuade a reasonable worker from making or supporting a charge" against her employer) (quoting Burlington N. and Santa Fe Ry. Co. v. White, 48 U.S. 53, 57, 68 (2006)).

71. Accordingly, NFCU discriminated against Plaintiff in violation of 12 U.S. Code § 5567(a).

72. As a result of NFCU's actions, Plaintiff suffered damages.

## COUNT II
## Virginia Human Rights Act Whistleblower Protection

### (Virginia HB 798)

73. Plaintiff incorporates the foregoing paragraphs as if set forth in their entirety herein.

74. Virginia HB 798, prohibits an employer from discharging, disciplining, threatening, discriminating against, penalizing, or taking other retaliatory action against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee reports a violation of any federal or state law or regulation to a supervisor or refuses an employer's order to perform an action that violates any federal or state law or regulation and the employee informs the employer that the order is being refused for that reason.

75. Defendant is an "employer" under Virginia HB 798, and Stevenson is an "employee."

76. In 2017, Stevenson reported to multiple supervisors that NFCU was not documenting and verifying compensating factors for mortgages and was pressuring underwriters to issue loans

without reasonable, good faith determinations that the consumer could repay, in contravention of 15 U.S. C. 1639c(a).

77. On July 19, 2018, Stevenson reported the same violation to employee relations, which investigated the matter until October 2018.

78. On October 19, 2018, Stevenson was stripped of her supervisory responsibilities, transferred to a different location and department, and given menial tasks not commensurate with an assistant manager position.

79. Accordingly, NFCU discriminated and retaliated against Stevenson in violation of Virginia HB 798.

80. As a result of NFCU's actions, Plaintiff suffered damages.

## JURY DEMAND

81. Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Michelle Stevenson, prays for the following relief:

Entry of judgment in favor of Plaintiff and against Defendant for

    a.    Back pay;

    b.    Front pay;

    c.    Return Plaintiff to her prior position or an equivalent position;

    d.    Compensatory damages;

    e.    Reimbursement of leave Plaintiff was required to use as a result of NFCU's retaliation against her.

    f.    Punitive damages;

    g.    Medical and other costs incurred as a result of Defendant's retaliation;

    h.    Reasonable attorneys' fees and court cost associated with this suit;

i. Awarding prejudgment interest, costs, and disbursement, as appropriate herein; and

j. Other such relief as this Court and jury deems equitable, appropriate, and just.

                            Respectfully submitted,

                            The Spiggle Law Firm, PC

                            */s/ April Fearnley*
                            April Fearnley, Esq.
                            4830 A 31st Street, South
                            Arlington, Virginia 22206
                            (703) 215-1123, ext. 5 (telephone)
                            (202) 540-8018 (facsimile)
                            Counsel for Plaintiff